### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **ELEVANCE HEALTH, INC.,**<br>220 Virginia Avenue<br>Indianapolis, Indiana 46204,<br><br>**COMMUNITY INSURANCE COMPANY,**<br>4361 Irwin Simpson Road<br>Mason, Ohio 45040,<br><br>**FREEDOM HEALTH, INC.,**<br>5411 Skycenter Drive<br>Tampa, FL 33607<br><br>**GROUP RETIREE HEALTH SOLUTIONS, INC.,**<br>1901 Market Street<br>Philadelphia, PA 19103<br><br>**WELLPOINT INSURANCE COMPANY,**<br>2505 N. Hwy. 360, Suite 300,<br>Grand Prairie, Texas 75050,<br><br>**WELLPOINT TEXAS, INC.,**<br>2505 N. Hwy. 360, Suite 300<br>Grand Prairie, Texas 75050,<br><br>Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA**, in his official capacity as Secretary of Health and Human Services, U.S. Department of Health and Human Services<br>200 Independence Avenue SW<br>Washington, D.C. 20201,<br><br>and<br><br>**CHIQUITA BROOKS-LASURE**, in her official capacity as Administrator, Centers for Medicare and Medicaid Services,<br>7500 Security Boulevard<br>Baltimore, Maryland 21244, | Case No. 4:24-cv-01064 |

| Defendants. | |
|---|---|

## AMENDED COMPLAINT

Plaintiffs Elevance Health, Inc. f/k/a Anthem Inc. ("Elevance Health"), along with its affiliated entities Community Insurance Company; Wellpoint Insurance Company; and Wellpoint Texas, Inc. (the "Health Plan Plaintiffs," and collectively with Elevance Health, "Plaintiffs"), by and through their undersigned counsel, hereby submit their Complaint for relief against Defendants Xavier Becerra, in his official capacity as Secretary of Health and Human Services ("HHS"), and Chiquita Brooks-LaSure, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services ("CMS"), to challenge unlawful, and arbitrary and capricious final agency action related to the Star Ratings system for Medicare Advantage and Part D health plan contracts, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 551-559 and 701-706.

## PRELIMINARY STATEMENT

1.     Medicare Advantage Star Ratings ("Star Ratings") have become one of the most critical aspects of the Medicare Advantage program, as they purport to measure a Medicare Advantage Organization's ("MAO") quality and performance, drive enrollment into "higher quality" MAOs, and enhance payments that are directly used to improve member benefits. Elevance Health, through its various health plans, contracts with CMS to operate MAOs. CMS evaluates the quality and performance of each MAO compared to other MAOs through a grading process called Star Ratings. To calculate Star Ratings, CMS measures each MAO's performance on approximately 40 different quality and performance measures based upon certain data sets to come up with a measure numerical score. CMS then takes the scores from all MAO contracts to create "cut points" so that CMS can grade how each MAO performed for each measure against

other MAOs, and then assign a Star of 1 through 5 for each measure. Each measure has a certain weight and then, those measure Stars are aggregated on a weighted basis to calculate an overall contract numerical score to six decimals, which CMS has rounded at the sixth decimal and then assigned a Star Rating of 1 through 5 using half-Star increments. In effect, Star Ratings grade each MAO on a curve at both the measure and overall Star Rating level because Star Ratings are intended to be used by Medicare beneficiaries, as well as brokers and agents, to identify the supposed highest quality plans.

2.      There is a growing chorus of voices challenging CMS's calculation of 2025 Star Ratings—as evidenced by at least four lawsuits being filed already (including one in this Court). Plaintiffs join that chorus to address Defendants' clearly arbitrary and capricious conduct and actions contrary to law in calculating Plaintiffs' 2025 Star Ratings for certain contracts.[1] Specifically, CMS has established a complex system through sub-regulatory guidance that purports to calculate an MAO's overall contract raw score to, and round at, the *millionth* (i.e., sixth) decimal to assign an overall Star Rating. Yet, CMS's calculation methodology is fraught with statistical variance, which can cause improper impacts on an MAO's overall Star Rating. CMS simply ignores this methodology error in an effort to create the illusion of precision. Furthermore, CMS performs calculations that double-penalize plans on certain measures without any statutory or regulatory basis for doing so, while suppressing or otherwise failing to disclose key data that prevents Plaintiffs from validating that CMS calculated the measure scores or overall Star Ratings correctly. Indeed, despite claiming to be able to calculate the overall contract scores

---

[1]      Last year, Elevance Health was forced to bring a lawsuit against Defendants due to their arbitrary and capricious conduct and actions contrary to law in calculating Elevance Health's 2024 Star Ratings. Elevance Health prevailed in that lawsuit. Elevance Health again is forced to bring this lawsuit to address CMS's separate and distinct arbitrary and capricious conduct and actions contrary to the law in connection with Plaintiffs' 2025 Star Ratings.

to the millionth decimal, CMS admits in its guidance that the calculations cannot be replicated—forcing Elevance Health and other MAOs to blindly accept that CMS performed the calculations correctly.

3.     Through its arbitrary and capricious conduct, CMS has determined that the overall contract score for one of Plaintiffs' contracts (known as H3655) is 3.749565, which CMS has rounded at the millionth decimal pursuant to the agency's sub-regulatory guidance to assign 3.5 Stars. However, that guidance has no basis in the statute or regulation. Instead, the applicable regulation requires CMS to calculate Star Ratings based upon half star increments, which would necessitate rounding any MAO's score at two decimals, such that a score of 3.75 rounds to a 4-Star Rating. Furthermore, CMS's process has inherent statistical variance and non-randomness that makes calculating the overall Stars Score to the millionth decimal arbitrary and capricious. By appropriately rounding H3655 at two decimals, it should be scored at 3.75, and be assigned 4 Stars. Due to CMS's actions, Plaintiffs have been damaged by at least $375 million, which directly harms both Plaintiffs and Medicare beneficiaries as these funds are reinvested in the plan including to decrease costs and improve member benefits.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331. This action arises under the Medicare Act, 42 U.S.C. § 1395 *et seq*.; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 and 706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

5.     Venue is proper under 28 U.S.C. § 1391(e).

6.     The Complaint was timely filed. *See* 28 U.S.C. § 2401.

7.     This Amended Complaint is properly and timely filed under Federal Rule of Civil Procedure § 15(a)(1).

## PARTIES

8.     Elevance Health is a healthcare company with its principal place of business in Indianapolis, Indiana. Elevance Health aims to transform healthcare by becoming a lifetime trusted partner to its members by focusing on whole health, including physical, behavioral, social, and pharmacy, with a goal to improve healthcare affordability, accessibility, quality, and equity.

9.     Elevance Health, through direct and indirect subsidiaries, among other things operates numerous health plans in 22 states and Puerto Rico to provide medical and prescription coverage to approximately 2.9 million Medicare beneficiaries under Medicare Parts C and D. Specifically, the following Plaintiffs are direct or indirect subsidiaries of Elevance Health that enter into contracts with Defendants to provide coverage to Medicare beneficiaries under Medicare Parts C and/or D:

      a.     Community Insurance Company has its statutory home office in Mason, Ohio, and has entered into a contract with CMS designated as H3655;

      b.     Freedom Health, Inc. has its statutory home office in Tampa, Florida, and has entered into a contract with CMS designated as H5427;

      c.     Group Retiree Health Solutions, Inc. has its statutory home office in Philadelphia, Pennsylvania, and has entered into a contract with CMS designated as H6078;

      d.     Wellpoint Insurance Company has its principal place of business in Grand Prairie, Texas, and has entered into a contract with CMS designated H8849; and

      e.     Wellpoint Texas, Inc. has its principal place of business in Grand Prairie, Texas, and has entered into a contract with CMS designated H2593.

10.    Elevance Health is the designated "parent organization" of contracts H3655, H5427, H6078, H2593, and H8849. MAOs are required to identify the parent organization for each contract, which means the legal entity that exercises a controlling interest in the organization that holds the actual contract. *See* 42 C.F.R. § 422.2.

11.    Defendant Xavier Becerra is sued in his official capacity as the Secretary of HHS. This includes overseeing the operations of CMS. Secretary Becerra, in his official capacity, is responsible for implementing and complying with federal law, including the federal laws impacted by this action.

12.    Defendant Chiquita Brooks-LaSure is sued in her official capacity as Administrator of CMS, an operating division of HHS. As Administrator, Ms. Brooks-LaSure is responsible for the administration of the Medicare health program, including Medicare Parts C and D. Administrator Brooks-LaSure, in her official capacity, is responsible for implementing and complying with federal law.

## FACTUAL ALLEGATIONS

### I.    The Medicare Advantage Program and Star Ratings

13.    The Medicare program, authorized under Title XVIII of the Social Security Act, is a federal health insurance program that generally provides certain healthcare benefits for people aged 65 and older and under 65 with certain disabilities or diseases. HHS is the federal agency responsible for administering the Medicare program and does so through CMS.

14.    Generally, people who are eligible for Medicare have two options to receive medical benefits. First, under Medicare Parts A and B (often referred to as "original" or "traditional" Medicare), eligible individuals may receive Medicare benefits directly from the

federal government. *See* 42 U.S.C. §§ 1395c to 1395i-6 (Part A); 42 U.S.C. §§ 1395j to 1395w-6 (Part B).

15.     Alternatively, under Medicare Part C—commonly referred to as the Medicare Advantage program as enacted by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003—CMS contracts with private organizations referred to as Medicare Advantage Organizations ("MAOs"). Medicare eligible individuals then may enroll in health plans offered by the MAO and the MAO is responsible for providing Medicare benefits to their enrollees.

16.     Medicare beneficiaries may also obtain prescription drug coverage through Medicare Part D. As with Medicare Advantage, the Part D prescription drug benefit provides coverage through organizations that contract with CMS to offer health plans that cover prescription drugs. These plan sponsors offer both standalone prescription drug plans ("PDPs") for individuals enrolled in traditional Medicare, as well as drug coverage with a Medicare Advantage plan (called a "MA-PD" plan). *See* 42 U.S.C. § 1395w–101(a)(1), (3)(C).

17.     In 2008, CMS began publishing annual Star Ratings for MAOs, which CMS determines by utilizing certain data sets, and rates each plan on a scale of 1 to 5 Stars. *See* 42 U.S.C. § 1395w-23(o); *see also* 42 C.F.R. Part 422, Subpart D. The goal of Star Ratings is to help Medicare beneficiaries "compare the quality of Medicare health and drug plans being offered so they are empowered to make the best health care decisions" and provide "meaningful information about quality, alongside information about benefits and costs, to assist them in comparing plans and choosing the Medicare coverage option that best fits their health needs."[2]

---

[2]     *See, e.g., 2025 Medicare Advantage and Part D Star Ratings*, CENTERS FOR MEDICARE & MEDICAID SERVICES (October 10, 2024), https://www.cms.gov/newsroom/fact-sheets/2025-medicare-advantage-and-part-d-star-ratings#:~:text=Approximately%2040%25%20of%20MA%2DPDs,or%20more%20stars%20in%202025.

18.    Star Ratings are based on a 5-Star scale, set in half-star increments, with 1 Star being the lowest rating and 5 Stars being the highest. *See* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii). CMS calculates Star Ratings by assessing and individually grading (by giving a 1 to 5-Star score) several "measures" that fall into broad categories designed to measure the quality of the plan. Each measure has a certain weight assigned to it, and then the scores for the individual measures are used to calculate an overall weighted Part C and Part D summary Star Rating and overall Stars Rating for each plan.

19.    The Star Rating assigned by CMS is significantly important to both an MAO and Medicare beneficiaries for several reasons, including enrollment and member benefits. For example, Medicare-eligible people can begin to openly enroll in MAOs during the "annual enrollment period," which is from October 15, 2024 to December 7, 2024. 42 U.S.C. § 1395w-21(e)(3)(B)(v). After the annual enrollment period, the Medicare Advantage "open enrollment period" takes place from January 1, 2025 through March 31, 2025, during which certain Medicare beneficiaries can continue to enroll in plans. In order to facilitate the plan selection process and to assist Medicare beneficiaries in choosing the coverage that is right for them, CMS maintains a website known as the "Medicare Plan Finder," which displays certain information about available plans, including the Star Ratings for the upcoming plan year. *See* 42 C.F.R. § 422.166(h).

20.    As expected, on October 10, 2024, CMS published Star Ratings through the Medicare Plan Finder. Beginning October 15, when selecting plans, Medicare beneficiaries, including any agents and brokers who assist those beneficiaries, began to rely upon those ratings. Star Ratings are intended to be used by Medicare beneficiaries to identify plans that CMS has identified as higher quality relative to other choices and, therefore, plans with higher Star Ratings have a significant advantage in enrolling beneficiaries. Conversely, MAOs with Star Rating below

a threshold receive a "low performance indicator" on the Medicare Plan Finder and may be prohibited from participating in other programs and expanding their service offerings to beneficiaries.

21.    In addition, under the Congressionally mandated "Quality Bonus Payment" program, MAOs that receive an overall Star Rating of 4 or more are entitled to higher payments from Defendants. Moreover, MAOs submit annual bids each year that CMS scores against a benchmark financial target. If an MAO submits a bid below the benchmark, the plan is able to retain a portion of the savings, referred to as a "rebate." An MAO's Star Rating affects the amount of rebate the plan can retain. Specifically, plans with a Star Rating of 3.0 or lower keep 50% of the rebate, plans with a Star Rating of 3.5 or 4.0 keep 65% of the rebate, and plans with a Star Rating of 4.5 or 5 keep 70% of the rebate. The plan must use the rebate to reduce premiums, coinsurance and/or cost-sharing, and/or increase health and related benefits. As a result, MAOs with higher Star Ratings can offer more competitive pricing and benefits to potential members and ensure that current members retain existing benefits.

## II.    How CMS Calculates Medicare Advantage Star Ratings

22.    An MAO's annual Star Rating is calculated as the weighted average of its Star Ratings across several individual measures. Specifically, CMS identifies certain measures that it intends to use in any given year for Medicare Advantage, Part D, or MA-PD plans. For instance, for 2025 Star Ratings, MA-PD plans are rated on approximately 40 unique quality and performance measures applicable to both Part C and Part D, whereas Medicare Advantage-only contracts are rated on approximately 30 Part C measures. Examples of those measures include C01 Breast Cancer Screening (the "percent of female plan members aged 52-74 who had a mammogram during the past 2 years") and C02 Colorectal Cancer Screening (the "percent of plan

members aged 50-75 who had appropriate screening for colon cancer"). Each measure is derived from a specified data source that, pursuant to the applicable statute, must have existed as of November 1, 2023. *See* 42 U.S.C. § 1395w–23(o); *see also* 42 U.S.C. § 1395w–22(e).

23.     To calculate an MAO's overall Star Rating, each measure receives a measure-specific numerical score based upon an analysis of the data identified by CMS for that particular measure. CMS then converts that numerical score into a measure-specific Star Rating on a five-star scale by determining "cut points" to separate each contract into the whole star increments. 42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4). Notably, measure-level Star Ratings involve the use of various data sources, which have their own rounding rules as CMS acknowledges. In addition, the measure scores for all contracts involve the conversion of granular data across the industry into cut points, so even minor data changes in the data can result in movements in the cut points which in turn can lead to significant changes in an MAO's measure-specific Star Ratings. Because those measure-specific Star Ratings are then used on a weighted basis to calculate the overall Star Rating, the small changes in the cut points can profoundly impact the overall Star Rating.

### III.     CMS Uses Two Methodologies to Calculate Cut Points and Assign Star Ratings

24.     CMS has outlined very detailed methodologies for calculating MA Star Ratings using two methodologies: (1) clustering and mean resampling for non-CAHPS measures; and (2) relative distribution and significance testing for CAHPS measures. 42 C.F.R. §§ 422.166(a)(2), (3); 423.186(a)(2), (3).

25.     "CAHPS" refers to the Consumer Assessment of Healthcare Providers & Systems survey, which is a survey conducted by CMS vendors that measures beneficiaries' experiences with their health plans. *See, e.g.,* 42 C.F.R. § 422.162(a). CAHPS survey scores are among the categories of data sources used to calculate member experience measures for Star Ratings.

26.    For non-CAHPS measures, starting in 2024, CMS has applied a three-step methodology to calculate the cut points. First, CMS takes all contracts for the year and utilizes a statistical methodology to remove Tukey "outer-fence outlier" contracts from the set of scores for a given measure. 42 C.F.R. §§ 422.166(a)(2)(i), 423.186(a)(2)(i). Second, once outliers are deleted from the data set, CMS applies mean resampling with hierarchical clustering to sort the measure scores into groups and establish the cut points. 42 C.F.R. §§ 422.166(a)(2)(i), 423.186-(a)(2)(i). The purpose and result of clustering and mean resampling is to partition the contract scores into distinct groups, such that the observations within a group are as similar as possible to each other, and as dissimilar as possible to observations in any other group. *See* 42 C.F.R. § 422.162(a); 83 Fed. Reg. at 16525.

27.    CMS regulations expressly require mean resampling to achieve a random separation of the applicable contracts into groups. *See* 42 C.F.R. § 422.162(a) ("Mean resampling refers to a technique where measure-specific scores for the current year's Star Ratings are randomly separated into 10 equal-sized groups"). In order to perform clustering and mean resampling, CMS takes all contracts (which receive "E," "H," "R," or "S" numbers, such as H3655) for a year and orders them in numeric order and then utilizes a "seed" (also called a "seed value" or "seed") to perform the clustering and mean resampling. A seed is an integer used to prompt a statistical software, such as SAS used by CMS, to generate a sequence of random numbers. The seed completely determines the sequence of otherwise random numbers, and is recorded to ensure that the results can be reproduced.

28.    In order to achieve the randomization required under the regulation, typically a different seed would be used each year and/or the contracts would be randomly ordered prior to the sample selection in running the clustering methodology. However, using the same seed and ordering

the contracts in the same order year over year could *result in non-random and potentially predictable outcomes from one year to the next.* Indeed, CMS uses the same seed of 8-6-7-5-3-0-9 each year as applied to the same order of contracts, resulting in non-randomization in its means resampling process—which is contrary to the regulatory requirement that means resampling must be random.[3] *See* 42 C.F.R. § 422.162(a).

29.     As the third and final step, CMS applies a "guardrail" to cap any change in the cut point compared to the prior year's actual cut points by five percent. 42 C.F.R. §§ 422.166-(a)(2)(i), 423.186(a)(2)(i).[4] Because measure-level Star Ratings are given whole stars, minor changes in the cut points or minor variations in the contract score can lead to a whole-star drop at the measure level and a drop in an MAO's overall Star Rating.

30.     Despite the critical importance of Star Ratings and the billions of dollars in quality bonus payments, much of which would be used for increasing member benefits, CMS has acknowledged that "[i]t is not possible to replicate CMS's calculations exactly due to factors including, but not limited to: using published measure data from sources other than CMS's Star Rating program which use different rounding rules, and exclusion of some contracts' ratings from publicly-posted data (e.g., terminated contracts)." *See* CMS, *Medicare 2025 Part C & D Star Ratings Technical Notes* ("2025 Technical Notes"), at p. 22 (Oct. 3, 2024), https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf. Not only is that admission troubling given what is at stake, the arbitrariness of the cut point calculation is driven home by the fact that the cut points themselves are subject to inherent variability. Indeed, by simply

---

[3]     The sequence 8-6-7-5-3-0-9 is unlikely a random selection given it is the refrain from the popular classic rock song, "867-5309/Jenny" by Tommy Tutone.

[4]     Last year, Elevance Health and at least one other plan were forced to sue CMS after it improperly applied the guardrail to cut points in violation of the applicable regulation, resulting in CMS recalculating cut points across the industry in order to comply with the law.

shuffling the contract sort order or changing the seed within the clustering methodology, different cut points can be and are generated, thus creating a "spread" of different cut points for any given non-CAHPS measure and Star threshold. In other words, there is inherent statistical variance or "noise" in cut point calculation, yet CMS does not account for that when performing its calculations. As a result, when a measure's numerical score is close enough to the CMS calculated cut point, the measure Star Rating could go up and, consequently, overall Star Rating could also go up, but do not for no other reason than how the contracts were ordered and the seed selected (which again CMS does in a way that is not random and contrary to the regulatory requirement). This is arbitrary and capricious.

31. For measures that are based on CAHPS survey data, CMS uses the relative distribution and significance testing methodology. 42 C.F.R. § 422.166(a)(3). The regulations provide that the methodology used for CAHPS calculations in fact "accounts for the reliability of scores produced from survey data." *See* 42 C.F.R. § 422.166(a)(3). To account for the particular challenges of a survey methodology, these regulations provide for adjustments to be made to an MAO's individual scores in various circumstances. For example, the regulations state that "no measure Star Rating is produced if the reliability of a CAHPS measure is less than .60." *See id*. Likewise, the regulations provide additional overrides on the scoring of a CAHPS measure between 1 – 5 Stars, including how an MAO's score compares to the national average CAHPS score for that measure and/or whether the score is determined to be reliable. *See id*.

32. Despite the clear regulatory methodology, CMS has developed regulatory guidance that deviates from the regulatory requirements. Specifically, CMS applies what is called a "case-mix adjustment" to "take into account differences in the characteristics of enrollees across contracts that may potentially impact survey responses," such as the enrollee age and education. 2025

13

Technical Notes, at p. 153. Those case-mix adjusted scores are then classified into "base groups" by reference to "percentile cut points defined by the current-year distribution of case-mix adjusted contract means." 83 Fed. Reg. at 16568. These percentile cut points are set at the 15th, 30th, 60th, and 80th percentiles. *See* 42 C.F.R. §§ 422.166(a)(3), 423.186(a)(3).

33.    In other words, CMS takes the raw CAHPS score for the contract and then adjusts the score up or down based upon the case-mix for the contract. However, the applicable regulations do not account for this case-mix adjustment when performing the relative distribution and significance testing methodology to determine the contract's measure-specific Star Rating. [5] *See, e.g.,* 42 C.F.R. § 422.166(a)(3). Indeed, case-mix adjustments are only referenced with respect to determining the "Categorical Adjustment Index" (which is a different adjustment to Star Ratings required by 42 C.F.R. § 422.166(f)(2)) and the Health Equity Index (which is a new Stars factor that does not apply until the 2027 Star Ratings per 42 C.F.R. § 422.166(f)(3)).

34.    After CMS applies this case-mix adjustment to the CAHPS data, CMS then compares the contract's score to the national mean and adjusts a contract's measure Star Rating from the base group if the case-mix adjusted score for the measure transgresses a certain statistical distance away from the measure. Thus, CMS may double-penalize contracts by first applying the case-mix adjustment and then further reducing the CAHPS score for a measure when the score is statistically significantly lower than the national mean for that measure. This double-whammy is not contemplated by the applicable statute or regulations, and because just small changes in measure scores can cause a measure to achieve a different Star Rating, it can have significant negative impacts.

---

[5]    CMS also applies a case-mix adjustment to a non-CAHPS measure *C15 - Plan All-Cause Readmissions*, and this case-mix adjustment application is likewise not addressed in the regulations. *See* 2025 Technical Notes, at p. 54-55.

35.     Further compounding the problem, CMS also acted arbitrarily and capriciously by hiding case-mix adjustment data, thereby preventing plans from auditing, replicating, or validating CMS's calculations. This is the case for Plaintiff contracts H3655, H5427, H6078, H2593, and H8849, where all of those contracts received reductions in measure scores due to case-mix adjustments but CMS has hidden the data, preventing Plaintiffs from validating those calculations. The drastic impact of the case-mix adjustment can be seen, for example, in Measure D05, Rating the Prescription Drug Plan, where contract H3655 received a case-mix adjustment of approximately -0.38, which negatively affected the contract scores. Despite the disproportionate impact of the case-mix adjustment, CMS has hidden the data that would be necessary for Plaintiffs to audit or replicate the calculations. Indeed, CMS applies a methodology where it "hides" certain data from the plan that is necessary to validate the case-mix adjustment.

36.     In the case of contract H3655, CMS suppressed certain data for survey findings affecting 10 or less beneficiaries, purportedly to avoid triangulation of the survey respondents. A similar impact can be seen across various measures found in contracts H5427, H6078, H8849 and H2593. As a result of these suppressed data measures, the case-mix adjustment cannot be verified. By suppressing the very data that would be necessary for Plaintiffs to validate their calculations and admitting it is therefore not possible for plans to replicate their calculations, CMS has calculated Plaintiffs' scores in a black box and in a manner that is arbitrary and capricious.

## IV.   CMS Acted Arbitrarily and Capriciously and Contrary to Law in Calculating the 2025 Star Ratings in Violation of 42 CFR § 422.166

### A.   CMS has Acted Contrary to Law and Arbitrary and Capricious By Rounding H3655's Star Rating Score of 3.749565 to the Millionth Decimal.

37.     Per the applicable regulations, Star Ratings are determined "on a 1- to 5-star scale ranging from 1 (worst rating) to 5 (best rating) in half-increments using traditional rounding rules." 42 C.F.R. § 422.166(d)(2)(iv). CMS guidance states that it will calculate an MAO's overall Star Rating to, and round at, the *millionth* (i.e., sixth) decimal. *See* 2025 Technical Notes, at pp. 22-23 ("The improvement measures, summary, and overall ratings are calculated with at least six digits of precision after the decimal whenever the data allow it" and "a summary or overall rating of 3.749999 rounds down to a rating of 3.5, and a rating of 3.750000 rounds up to rating of 4").

38.     However, there is no statutory or regulatory basis for calculating an MAO's overall Star Rating to, or rounding at, the millionth decimal. To be sure, the applicable regulation requires Star Ratings to be calculated in half star increments, which would necessitate rounding at the second decimal to ensure a halfway point between the half stars of 3.75. Nevertheless, it appears that CMS rounds at the millionth decimal to create an illusion of precision when, in fact, these calculations are anything but precise. Indeed, CMS's failure to account for statistical variability and CMS's own suppression of data necessary to replicate its calculations highlights the absurdity of purporting to calculate Plaintiffs' overall Star Ratings with alleged extreme precision. There is inherent statistical variance in the underlying cut points and CMS admits that it is impossible to replicate its cut point calculations at all, let alone within a known precision. Accordingly, calculating to and rounding at the millionth decimal for a final Star rating derived from these variable cut points is not reasonable from a statistical or mathematical standpoint.

39.     CMS's arbitrary and capricious conduct has caused Plaintiffs significant harm. For example, CMS calculated Plaintiffs' H3655 contract to receive a raw overall score of 3.749565,

which is 0.000435 away from 4 Stars. Had CMS rounded to the hundredth (i.e., second) decimal, as would be appropriate when rounding to a half-star increments, H3655 would have been awarded 4 Stars. The same is true if CMS even calculated the score to the thousandth (i.e., third) decimal. Yet, by rounding that score to the *millionth* decimal, CMS treated the H3655 contract as having a score of 3.5 Stars, as opposed to 4 Stars.

**B.    CMS has Acted Contrary to Law and Arbitrary and Capriciously When it Calculated the CAHPS Measure Scores.**

40.    Further, CMS violated its regulations and acted arbitrary and capriciously when it calculated CAHPS measures by first adjusting for the case-mix index, and then adjusting again for the score's reliability and distance from the national mean, resulting in a double penalization.

41.    Doing so has damaged Plaintiffs' H3655, H6078 and H8849 contracts and resulted in compounded arbitrary adjustments for various CAHPS measures.

42.    CMS's arbitrary and capricious conduct and actions contrary to the law have caused Plaintiffs at least $375 million in damages related to the H3655 contract alone in the form of lost quality bonus payments and rebate retention, which would be used to increase benefits to the Medicare beneficiaries that Plaintiffs serve.

**V.    CMS's Plan Preview Period**

43.    Prior to publishing a plan's Star Ratings, CMS administers two plan preview periods—referred to as "Plan Preview 1" and "Plan Preview 2." *See* 42 C.F.R. § 422.166(h)(2). The purpose of these plan preview periods is to allow MAOs to review the data underlying the Star Rating calculations and challenge data errors or inconsistencies. To protect plans against erroneous evaluations that could unfairly undermine their ability to compete for customers, CMS initiates and concludes this process before it finalizes the Star Ratings and publishes them on the Medicare Plan Finder.

44.     Plan Preview 1 lasted from August 7-14, 2024 and allowed for review of the methodology and posted numeric data for each measure. *See* 83 Fed. Reg. 16440, 16588 (April 16, 2018); HPMS Memo, *First Plan Preview of 2025 Medicare parts C and D Star ratings Data*, Aug. 6, 2024.

45.     Plan Preview 2 occurred from September 6-13, 2024. *See* 83 Fed. Reg. 16440, 16588 (April 16, 2018); HPMS Memo, *Second Plan Preview of 2025 Medicare parts C and D Star ratings Data*, Sept. 5, 2024. During Plan Preview 2, CMS is tasked with making any revisions necessitated by changes arising during Plan Preview 1 and allows plans to review their preliminary Star Ratings for each measure, domain, summary Star Rating, and overall Star Rating.

46.     Critical to the plan preview process is data validation. During this timeframe, CMS is supposed to provide all data necessary to validate the Star Ratings. As CMS explained when implementing the applicable regulation, the plan preview periods allow "sponsors to review and raise any questions about their own plan's data prior to the public release of data for all plans" in order to allow for "necessary corrections" prior to the Star Ratings being announced to the public. *See* 83 Fed. Reg. at 16588. This is consistent with CMS's position that, for the Star Ratings to be a "true reflection of the quality, performance and experience of the beneficiaries enrolled in MA and Part D contracts," the data and measure-level Star Ratings must be "complete, accurate, and unbiased." *Id*. at 16567. CMS does not provide that sufficient data to ensure that the Star Ratings are complete, accurate, and unbiased.

## VI.    <u>Final Agency Action</u>

47.    CMS's Star Ratings decision for Plaintiffs, which includes among other things the agency's final decision about Plaintiffs' Star Scores, is a final agency action within the meaning of 5 U.S.C. § 704.

48.    CMS's Star Ratings decision is an "order" constituting an agency's final disposition in a matter other than rule making and, therefore, qualifies as an agency action within the meaning of 5 U.S.C. §§ 551(6) and (13).

49.    On October 10, 2024, through the Medicare Plan Finder, CMS published the final Star Ratings to the public. CMS's Star Rating decision is a final agency action because, as noted above, the ratings are publicly available and announced for current and potential beneficiaries to consider during 2025 enrollment.

50.    Further, CMS's Star Ratings decision is a final agency action because it determines Plaintiffs' legal rights and obligations and otherwise triggers legal consequences for Plaintiffs, including, but not limited to, by impacting enrollment and quality bonus payments.

51.    Plaintiffs are unable to mitigate the harm resulting from Star Ratings because CMS lacks a process for relief[6] that could render a decision in time. Plaintiffs have therefore been forced to file this action as Plaintiffs stand to suffer reputational harm, loss of potential and actual customers, and hundreds of millions of dollars unless this Court intervenes.

---

[6]    Although there is a non-mandatory reconsideration and informal hearing process available for CMS's quality bonus payment ("QBP") determinations, such informal process occurs after CMS's final decision and publication of the Star Ratings. *See* 42 C.F.R. § 422.260. The informal QBP reconsideration process only allows for extremely narrow challenges of limited data and Plaintiffs are not permitted to raise any of the challenges raised here. Elevance Health and all of its plans reserve the right to utilize the informal process where appropriate for additional issues that may be supplemented here at a later date if and when applicable.

## CLAIMS FOR RELIEF

### *First Claim For Relief*

*(Violation of Administrative Procedure Act – Arbitrary and Capricious Agency Action and Contrary to Law) (Contracts H3655, H2593, and H8849)*

52.     Plaintiffs incorporate the Paragraphs 1 through 50 of this Complaint as if set forth fully herein.

53.     The APA, 5 U.S.C. §§ 551-559 and 701-706, provides for judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702. Under 5 U.S.C. § 706(2)(A), an agency action can be held unlawful and set aside if it is "arbitrary, capricious . . . or otherwise not in accordance with law."

54.     CMS is responsible for administering the Medicare program, including the Medicare Star Rating system.

55.     CMS calculates overall Star Ratings by rounding to the *millionth* (i.e., sixth) decimal, despite the fact that there is no statutory or regulatory basis for doing so.

56.     Calculating Star Ratings to the millionth decimal is arbitrary and capricious because there is inherent unreliability and statistical variance in the data used and calculations performed for the underlying measures.

57.     For example, CMS uses clustering and mean resampling to calculate cut points for non-CAHPS measures, which by regulation must involving *random* mean resampling. *See* 42 C.F.R. § 422.166(a)(2)(i). However, CMS uses the same sort order and seed, causing non-randomization in violation of the applicable regulation.

58.     CMS also fails to account for statistical error in calculating cut points. Using statistical principals that have inherent variability while failing to account for statistical error is arbitrary and capricious.

59.     CMS also acted arbitrarily and capriciously in hiding case-mix adjustment data and preventing plans from validating calculations for their Star Ratings, including Plaintiffs' contracts H3655, H5427, H6078, H2593, and H8849. For example, in contract H3655 CMS applied a case-mix adjustment of approximately -0.38 across the rate of prescription drug plans measure, which negatively affected the contract scores. However, CMS suppressed certain data for survey findings affecting 10 or less beneficiaries purportedly to avoid triangulation of the survey respondents. As a result of these suppressed data measures, the case-mix adjustment cannot be verified. Indeed, CMS admits "it is not possible to replicate CMS's calculations . . . ." 2025 Technical Notes, at p. 22.

60.     By hiding data and admitting that its calculations cannot be replicated, CMS has prevented Plaintiffs from validating their 2025 Star Ratings, which constitutes arbitrary and capricious conduct.

61.     Having failed to account for the statistical and methodological errors in its calculation of overall Star Ratings and suppressed data that would be necessary for Plaintiffs to replicate its scores, CMS acted arbitrarily and capriciously by rounding Plaintiffs' overall Star Ratings to the millionth decimal without any statutory or regulatory basis for doing so, and harmed Plaintiffs.

62.     CMS's arbitrary and capricious conduct and actions contrary to the law have caused Plaintiffs at least $375 million in damages related to the H3655 contract alone in the form of lost quality bonus payments and rebate retention.

63.     Plaintiffs therefore respectfully request the relief as prayed for below.

### *Second Claim For Relief*

*(Violation of Administrative Procedure Act – Arbitrary and Capricious Agency Action and Contrary to Law) (Contract H3655)*

64.    Plaintiffs incorporate Paragraphs 1 through 50 of this Complaint as if set forth fully herein.

65.    Under 5 U.S.C. § 706(2)(A), an agency action can be held unlawful and set aside if it is arbitrary or capricious.

66.    CMS's actions as applied to Plaintiffs were arbitrary and capricious because they were contrary to law.

67.    CMS violated its regulations and acted arbitrary and capriciously when it calculated CAHPS measures by first adjusting for the case-mix index, and then adjusting for the score's reliability and distance from the national mean, resulting in a double penalization.

68.    Doing so has damaged Plaintiffs with respect to the measure and/or overall Star Rating for contracts H3655, H6078, and H8849 by compounded arbitrary adjustments.

69.    CMS's arbitrary and capricious conduct and actions contrary to the law have caused Plaintiffs at least $375 million in damages related to the H3655 contract alone in the form of lost quality bonus payments and rebate retention, which would be used to increase benefits to Plaintiffs' members.

70.    Plaintiffs therefore respectfully request the relief as prayed for below.

### *Third Claim For Relief*

*(Declaratory Judgment)*

71.    Plaintiffs incorporate Paragraphs 1 through 50 of this Complaint as if set forth fully herein.

72.     CMS's calculation of the 2025 Star Ratings is a final agency action made reviewable by 5 U.S.C. § 706(2).

73.     Plaintiffs are adversely affected and harmed by the calculation of their Star Ratings.

74.     Plaintiffs request a declaration from this Court under 28 U.S.C. § 2201 that Defendants' calculations are arbitrary and capricious and contrary to law when the scores are rounded to the millionth (i.e., sixth) decimal instead of the hundredth (i.e., second) decimal.

75.     Plaintiffs request a declaration from this Court under 28 U.S.C. § 2201 that Defendants' calculations that adjust CAHPS measures in violation of its own regulation is arbitrary and capricious and contrary to law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to:

A.     Enter judgment against Defendants and in favor of Plaintiffs for each count alleged in this Complaint;

B.     Order Defendants to recalculate the score for contract H3655 to 3.75 and corresponding Star Rating to 4.0 Stars;

C.     Order Defendants to provide all data for Plaintiffs' contracts, including, but not limited to, H2593, H3655, H5427, H6078, and H8849, necessary to validate 2025 Star Ratings calculations and future Star Ratings calculations.

D.     Order Defendants to recalculate CAHPS measures for contracts H2593, H3655, H5427, H6078, and H8849 without first adjusting for case-mix, consistent with their regulations.

E.     Grant such other and further relief as the Court deemed just and proper.

Dated: December 23, 2024

Respectfully submitted,

**ELEVANCE HEALTH, INC. and the HEALTH PLAN PLAINTIFFS**

By: */s/ Lesley C. Reynolds*

Lesley C. Reynolds
Northern District of Texas Bar No. 487580DC
Lara E. Parkin *(pro hac vice)*
David A. Bender (*pro hac vice*)
REED SMITH LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
(202) 414-9200 telephone
(202) 414-9299 facsimile
lreynolds@reedsmith.com
lparkin@reedsmith.com
dbender@reedsmith.com

Martin J. Bishop
Texas Bar No. 24086915
Steven D. Hamilton (*pro hac vice*)
REED SMITH LLP
10 South Wacker Drive
40th Floor
Chicago, IL 60606
(312) 207-1000 telephone
(312) 207-6400 facsimile
mbishop@reedsmith.com
shamilton@reedsmith.com

Scott T. Williams
Texas Bar No. 00791937
REED SMITH LLP
2850 N. Harwood Street
Suite 1500
Dallas, TX 75201
(469) 680-4200 telephone
(469) 680-4299 facsimile
scott.williams@reedsmith.com

*Counsel for Plaintiffs*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of December, 2024, a true and correct copy of this

Amended Complaint was filed via the Court's CM/ECF system.

*/s/ Lesley Reynolds*
Lesley C. Reynolds